IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 25-06-BLG-SPW |
| Plaintiff, | |
| vs. | ORDER ON MOTIONS TO SUPPRESS AND DISMISS INDICTMENT |
| RYAN TAYLOR DITONNO and BRITNI DENAE GRIGGS, | |
| Defendants. | |

Before the Court are Defendant Ryan Taylor Ditonno's Motion to Suppress Evidence and Dismiss Indictment (Doc. 41) and Defendant Britni Denae Griggs's Motion to Dismiss (Doc. 44). Both Defendants seek to suppress all evidence obtained as a result of a traffic stop on July 9, 2024, and to dismiss the Indictment (Doc. 2), asserting that the evidence was obtained in violation of the Fourth Amendment. (*See* Docs. 42, 45). Ditonno contends that the initial traffic stop lacked reasonable suspicion, that the stop was unlawfully prolonged, and that the subsequent searches of the vehicle and storage unit were improper as probationary searches or searches incident to arrest. Griggs joins in Ditonno's arguments and additionally asserts that her consent to search was coerced. The Government opposes the Motions. (Doc. 51).

1

The Court held a hearing on January 23, 2026, at which three law enforcement witnesses testified. The Court finds no material facts in dispute based on the parties' briefing, the witnesses' testimony, and related video footage.

For the following reasons, the Court denies both Motions.

## I.    Background

On July 9, 2024, a confidential source told law enforcement that "Ryan" and "Britni" were living in and selling drugs from a storage unit—possibly First Interstate Storage—near Honda & Marine off Goodman Drive in Billings. (Doc. 42-1 at 1; Doc. 42-2 at 1). The source stated they were driving an older Ford F-150, "believed to be tan in color." (Doc. 42-1 at 1). The source also provided telephone numbers for both individuals, and officers confirmed the numbers belonged to Ryan Ditonno and Britni Griggs. (*Id.*).

Billings Police Department ("BPD") Detective Steve Hallam ("Hallam") discovered that Ditonno was on parole and had an active $500 Billings Municipal Court warrant for traffic violations. (Doc. 42-2 at 1). Hallam went to First Interstate Storage at 2145 Goodman Lane to look for Ditonno or Griggs and to locate the "tan/gold" pickup truck. (*Id.*). The storage company confirmed that neither individual rented a unit there. (*Id.*). Hallam then noted another storage facility—My Place Storage—across the street. (*Id.*). While at First Interstate Storage, he

observed an older F-150 exiting My Place Storage. (*Id.*). He saw two occupants and noted the driver was female but could not identify either person. (*Id.*).

Hallam followed the vehicle and asked BPD Officer James Catlin ("Catlin") to run the license plate. (Doc. 42-3 at 1). The temporary plate returned as "inactive," prompting BPD Officer Travis Fjetland ("Fjetland") to initiate a traffic stop. (*Id.*; Doc. 42-1 at 1). After stopping the truck, Fjetland advised the female driver that the stop was due to the inactive plate and asked both occupants to identify themselves. (Doc. 43, Ex. 505 at 0:21–1:04 [hereinafter Ex. 505]). The driver identified herself as Britni Griggs. (*Id.* at 0:55–0:57). The male passenger falsely identified himself as "James from Oklahoma." (*Id.* at 1:04–06).

While Fjetland spoke with Griggs, Hallam approached the passenger side. (Doc. 43, Ex. 506 at 1:10–1:30 [hereinafter Ex. 506]). Fjetland signaled that the vehicle matched the source's description and informed Hallam that the passenger had provided a false name. (*Id.* at 1:10–1:22; Doc. 42-2 at 1). Hallam testified that he immediately recognized Ditonno from previous interactions. Within two minutes of the stop, Hallam ordered Ditonno out of the vehicle, handcuffed him, advised him of his *Miranda* rights, and placed him under arrest. (Ex. 506 at 1:22–2:40).

Ditonno invoked his right to counsel. (*Id.* at 2:24–27). During a search incident to arrest, Hallam found a small amount of methamphetamine, a digital scale, knives, and cash in Ditonno's pockets. (*Id.* at 2:30–4:05; Doc. 42-2 at 1). Hallam

informed Ditonno that he was being arrested on the municipal warrant and for absconding probation. (Ex. 506 at 4:55–5:03).

While Hallam searched Ditonno, Fjetland continued speaking with Griggs. (Ex. 505 at 2:26–5:40). Griggs stated the truck did not belong to her or to Ditonno and that she had been using it for about a week. (*Id.* at 2:37–2:51). Fjetland asked her to exit the vehicle and read her *Miranda* rights. (*Id.* at 3:04–4:12).

When asked about drugs in the vehicle, Griggs initially hesitated but then admitted she had some "personal stuff." (*Id.* at 4:30–35). She voluntarily retrieved her backpack, handed it to officers, and consented to its search, including providing the combination to a locked box inside. (*Id.* at 5:05–6:45).

Griggs stated that she had come from her storage unit. (*Id.* at 7:32–51). Hallam confronted her with the source's information and suggested there could be leniency if she was truthful. (*Id.* at 8:05–9:04). She admitted there were a couple of ounces of methamphetamine in the storage unit but was vague about its exact location and the extent of her access. (*Id.* at 9:29–58). After Hallam pressed her, she provided the unit number and described where she last saw the drugs. (*Id.* at 9:55–10:56).

Fjetland asked for consent to search the entire truck. (*Id.* at 11:03–10). Griggs began crying, saying she had never experienced anything like this. (Ex. 506 at 11:01–17). Hallam moved her to his vehicle, telling her she was not under arrest but

4

was being separated from Ditonno and placed somewhere cooler. (*Id.* at 11:20–12:15). He added that he would leave the door open for her. (*Id.* at 11:58–12:01). She continued to cry. (*Id.* at 12:12–58). Hallam again confronted her with information about their drug trafficking, and she acknowledged picking up individuals from the bus station. (*Id.* at 12:52–13:22).

Griggs then described the most recent drug delivery and confirmed they expected five pounds. (*Id.* at 15:15–17:19). She continued answering questions about their trafficking activities, including that methamphetamine was currently stored in the unit. (*Id.* at 17:20–22:03). She provided the gate code, admitted she had a key to the unit, and estimated there was a "pound or two left." (*Id.* at 22:11–23:28). When asked if she would give written consent to search the unit, she agreed and ultimately signed written consent forms for both the unit and the vehicle. (*Id.* at 25:03–12; Doc. 42-1 at 2; Doc. 42-2 at 2).

Ditonno later requested to speak with Hallam. (Ex. 505 at 25:36–40). Hallam reminded him that he had invoked his right to remain silent and that they would not discuss the drug investigation. (Ex. 506 at 26:50–27:03). Ditonno asked to speak privately and waived his right to counsel. (*Id.* at 27:03–17).

Hallam confronted him with the trafficking information. (*Id.* at 28:26–29:42). Ditonno asked to hug Griggs, and Hallam responded that he first wanted to know what was in the storage unit. (*Id.* at 29:41–48). Ditonno denied knowing what was

5

in the unit, and then stated, "The blues are coming in from Denver. . . . You know me from the past, I sell dope. . . . I don't sell blues." (*Id.* at 29:49–31:45). He admitted to receiving six pounds of methamphetamine the previous week and five pounds during the prior shipment. (*Id.* at 31:56–32:22). He again conditioned further cooperation on being allowed to hug Griggs. (*Id.* at 32:55–33:05). He estimated that one to two pounds remained, possibly in the storage unit. (*Id.* at 33:11–41).

After Griggs and Ditonno embraced, the officers discussed the upcoming search of the storage unit. (*Id.* at 34:15–35:30). Hallam then explained to Ditonno that he retained some degree of an expectation of privacy in his belongings inside the unit. (*Id.* at 35:31–37:02). Ditonno verbally consented to a search of his belongings in the unit but then invoked his right to counsel rather than sign a written consent form. (*Id.* at 37:02–25).

Following Griggs's consent to search the vehicle, BPD Officers Michael Beechie ("Beechie") and Catlin conducted the search. (Doc. 42-3 at 1; Doc. 42-4 at 1–2). They found a locked safe, which Griggs unlocked, containing over $7,000 cash. (Doc. 42-4 at 1; Doc. 42-1 at 2). They also found a locked soft-sided case on the passenger floorboard. (Doc. 42-4 at 1). Hallam cut it open in front of Ditonno, discovering approximately half a pound of methamphetamine, several fentanyl pills, and drug paraphernalia. (Ex. 505 at 43:52–44:12; Doc. 42-1 at 2). Both Griggs and

Ditonno denied ownership of the case. (Ex. 505 at 40:44–43:30, 43:42–47). Ditonno was transported to jail based on the probation violation and the outstanding warrant. (Ex. 506 at 44:30–46:03; Doc. 42-2 at 2).

Hallam, Griggs, and her dog then traveled to the storage unit. (Ex. 506 at 50:33–56:20). Griggs provided the gate and door codes. (*Id.* at 56:21–57:18). The search revealed approximately two pounds of methamphetamine in a metal tool chest. (Doc. 42-1 at 2). After the search, officers returned her to her vehicle, and she "was free to go." (*Id.*).

On January 16, 2025, a grand jury returned a two-count Indictment charging Ditonno and Griggs with (1) Conspiracy to Possess with the Intent to Distribute and to Distribute Controlled Substances, in violation of 21 U.S.C. § 846, and (2) Possession with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2.

## II.    Legal Standard

### A.    *Motion to Suppress*

A defendant may challenge the admissibility of evidence prior to trial under Federal Rule of Criminal Procedure 12(b)(3)(C), which governs motions to suppress evidence. The foundation for such challenges lies in the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

"In order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, [the United States Supreme] Court . . . conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968) (citing *Weeks v. United States*, 232 U.S. 383 (1914)).

When law enforcement violates a defendant's Fourth Amendment rights, the exclusionary rule mandates that "all evidence seized as a result of the [violation] must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001). A defendant has the ultimate burden of proof on a Fourth Amendment motion to suppress. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).

B.    *Motion to Dismiss*

Federal Rule of Criminal Procedure 12(b)(1) permits a party to raise "any defense, objection, or request that the court can determine without a trial on the merits" through a pretrial motion. A pretrial motion is appropriate when it raises a legal question rather than a factual dispute. *United States v. Shortt Acct. Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986). When a motion "raises factual questions associated with the validity of the defense, the district court cannot make those determinations"

8

before trial. *United States v. Schafer*, 625 F.3d 629, 635 (9th Cir. 2010) (citing *Shortt Acct. Corp.*, 785 F.2d at 1452).

Rule 12(b)(1) allows dismissal of an indictment prior to trial when undisputed facts demonstrate that the government cannot prove an essential element of the offense. *United States v. Phillips*, 367 F.3d 846, 855 n.25 (9th Cir. 2004) (citing *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994)).

## III.    Discussion

The Court first concludes that reasonable suspicion supported the initial traffic stop based on the inactive license plate. It then considers the duration of the encounter and determines that the stop was not unlawfully prolonged because it immediately evolved into a drug investigation. Finally, the Court evaluates the circumstances of Griggs's consent and finds that her consent was voluntarily given.

### A.    *Reasonable Suspicion for Traffic Stop*

First, law enforcement had reasonable suspicion to conduct the initial traffic stop. Under the Fourth Amendment, a seizure occurs "when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). A traffic stop is a seizure, but it is "a relatively brief encounter," "more analogous to a . . . *Terry* stop than to a formal arrest." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citation modified).

An officer may initiate an investigatory stop of a vehicle when reasonable suspicion exists, supported by "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in [a traffic-code violation]." *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000) (quoting *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)). When an officer has reasonable suspicion that an individual has violated the traffic code, the stop is "reasonable under the Fourth Amendment [and] the evidence thereby discovered admissible." *United States v. Choudhry*, 461 F.3d 1097, 1102 (9th Cir. 2006) (quoting *Whren v. United States*, 517 U.S. 806, 819 (1996)).

The reasonable-suspicion inquiry is objective. "[I]t does not turn either on the subjective thought processes of the officer or on whether the officer is truthful about the reason for the stop." *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016). Thus, if objective facts establish reasonable suspicion, the stop is lawful "even if the officer made the stop only because he wished to investigate a more serious offense." *Id.* (citing *Whren*, 517 U.S. at 812–13). Likewise, "a traffic-violation arrest will not be rendered invalid by the fact that it was a mere pretext for a narcotics search." *Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001) (citation modified) (quoting *Whren*, 517 U.S. at 812–13).

10

Here, law enforcement had reasonable suspicion to initiate a traffic stop of the vehicle driven by Griggs. Hallam observed a Ford F-150 exiting the My Storage facility with a temporary Montana license plate. (Doc. 42-2 at 1). A Criminal Justice Information Network (CJIN) check revealed that the plate was inactive.[1] (Doc. 42-1 at 1). Montana law requires that vehicles have "properly registered" license plates "conspicuously displayed" while operating within the state. Mont. Code Ann. § 61-3-301(1)(a) (2023). A violation of this requirement constitutes a misdemeanor. *Id.* § 61-3-601.

Fjetland initiated the stop based on the inactive plate. (Doc. 42-1 at 1). The officers' observation of the plate and their confirmation that it was inactive—in violation of Montana law—provided the specific, articulable facts necessary to establish reasonable suspicion. Regardless of any subjective investigative motives the officers may have had, including interest in potential drug activity, the traffic-code violation supplied a lawful basis for the stop.[2]

---

[1] Relying on the dispatch log for the traffic stop (Doc. 42-6), Ditonno contends that "[t]he temporary plate was not run until after the stop." (Doc. 56 at 4–5). However, the officers testified that they ran the plate before initiating the stop and relied on that information as the basis for the stop. Fjetland explained that they can run a CJIN check directly from their in-car computer without contacting dispatch, and that doing so would not generate a contemporaneous dispatch entry.

[2] The parties devote substantial argument to whether the confidential source supplied reasonable suspicion for the stop. Courts evaluate the "indicia of reliability" of a confidential source when an investigatory stop is premised on the source's information. *United States v. Rowland*, 464 F.3d 899, 907–08 (9th Cir. 2006). Here, however, the Court need not decide whether the source's information was sufficiently reliable, because the vehicle's traffic-code violation independently provided a clear and adequate basis for the stop. Any discrepancies between the source's information and the encounter—such as the vehicle's color—are therefore immaterial.

B.    *Prolonging the Stop*

Next, the traffic stop could not have been unlawfully prolonged. For Ditonno, the stop transitioned immediately into an arrest-based encounter. As soon as officers discovered drugs on his person, the encounter became a drug investigation for both occupants.

A traffic stop is a seizure under the Fourth Amendment and "must be 'justified at its inception, and . . . reasonably related in scope to the circumstances which justified the interference in the first place.'" *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 185 (2004) (quoting *United States v. Sharpe*, 470 U.S. 675, 682 (1985)). "When the police pull someone over for a traffic violation, the officer can obviously investigate that traffic infraction." *United States v. Ramirez*, 98 F.4th 1141, 1143–44 (9th Cir. 2024) (citing *Rodriguez*, 575 U.S. at 354). An officer may carry out the stop's mission, including "ordinary inquiries incident to the traffic stop." *United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019) (citations and internal quotation marks omitted). These inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (quoting *Rodriguez*, 575 U.S. at 349).

Officers may also order the driver or passengers to exit the vehicle, request identification, and ask questions about travel without exceeding the scope of the

stop. *Rodriguez*, 575 U.S. at 356 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)); *United States v. Williams*, 419 F.3d 1029, 1031 (9th Cir. 2005). Each of these duties share the same purpose as traffic enforcement itself: "ensuring that vehicles on the road are operated safely and responsibly." *Landeros*, 913 F.3d at 868 (quoting *Rodriguez*, 575 U.S. at 349).

A stop "becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Rodriguez*, 575 U.S. at 350–51 (citation modified) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). However, a traffic stop may be lawfully extended when it evolves into an arrest or when officers develop reasonable suspicion of an independent offense.

First, when an officer knows before initiating a stop that a passenger has an outstanding warrant, that warrant provides an independent and sufficient basis for arrest once the officer encounters that passenger. *See Moreno v. Baca*, 431 F.3d 633, 640 (9th Cir. 2005). An arrest pursuant to a warrant satisfies the Fourth Amendment so long as the officer has "a good faith, reasonable belief that the arrestee was the subject of the warrant." *Rivera v. County of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014).

Once a lawful arrest occurs, the *Rodriguez* traffic-stop analysis no longer governs the officer's conduct. *See, e.g., United States v. Castillo*, No. 4:17-CR-033, 2017 WL 3723641, at *2 (D. Idaho Aug. 29, 2017) (holding that once the defendant

13

was arrested, "the traffic stop was transformed into an arrest situation and *Rodriguez* no longer applies"); *United States v. Wright*, No. 2:21-cr-00024-APG, 2023 WL 6121848, at *6 n.2 (D. Nev. Aug. 15, 2023) ("Once [the defendant] was under arrest, the stop was no longer a *Terry* stop and thus, officers could not have prolonged the stop."). After the stop transitions into an arrest, the Fourth Amendment does not require officers to issue a citation—or even mention the traffic infraction—for the encounter to remain lawful. *See United States v. Willis*, 431 F.3d 709, 717 (9th Cir. 2005).

Second, officers may lawfully extend a traffic stop "to conduct an investigation into matters other than the original traffic violation" when they develop "reasonable suspicion of an independent offense." *Landeros*, 913 F.3d at 867.

Here, the traffic stop was not prolonged; it shifted almost immediately into a drug investigation. Hallam knew before the stop that Ditonno had an outstanding warrant. (Doc. 42-2 at 1; *see also* Doc. 42 at 15 ("Discovery demonstrates the Officers knew [Ditonno] had a $500 municipal court warrant.")). Based on his prior interactions with Ditonno and information from the confidential source, Hallam had a good faith, reasonable belief that Ditonno was the passenger as soon as he reached the window. Once he recognized Ditonno—which he testified occurred immediately upon reaching the window—he had independent legal authority to arrest him. At that point, the Fourth Amendment permitted Hallam to detain Ditonno for the arrest

14

and conduct a search incident to that arrest.[3] That arrest, supported by the warrant, terminated the traffic-stop mission as to Ditonno.

As for Griggs, Fjetland initially performed routine traffic-stop tasks: he explained the reason for the stop, requested her license, registration, and insurance, and asked both occupants to identify themselves. (Ex. 505 at 0:25–1:28). While Griggs was still searching for her license, Ditonno was searched incident to arrest and found with methamphetamine and paraphernalia. (Ex. 506 at 1:40–2:55). At that point, although the drugs found on Ditonno may not have established probable cause to arrest Griggs, they certainly supplied officers with reasonable suspicion of an independent drug offense involving both occupants.

Fjetland then asked Griggs to exit the vehicle, conducted a pat-down, and read her *Miranda* rights. (Ex. 505 at 3:05–4:11). After a few questions about the drugs, Griggs quickly volunteered to surrender the amount she possessed for personal use. (*Id.* at 4:14–5:10).

Because the encounter ceased to be a traffic stop and became a drug investigation for both defendants, *Rodriguez* no longer applies. The stop therefore could not have been unlawfully prolonged.

---

[3] Under the search incident to arrest exception to the warrant requirement, once a lawful arrest has been made, officers may search both the arrestee and the area within the arrestee's immediate control—meaning "the area into which an arrestee might reach in order to grab a weapon or evidentiary items." *Chimel v. California*, 395 U.S. 752, 763 (1969). Ditonno concedes that "[f]risking [his] person upon his arrest is reasonable for officer safety." (Doc. 42 at 19).

C.    *Consent to Search Vehicle and Storage Unit*

Finally, the searches of the vehicle and storage unit were valid under the consent exception to the warrant requirement.[4]  Ditonno errs in asserting that the encounter violated the Fourth Amendment because officers "could have stopped and applied for a search warrant of the Ford and storage unit based on what they had found upon [his] arrest." (Doc. 42 at 17).  When a valid exception to the warrant requirement applies, officers are not obligated to suspend their investigation to obtain a warrant; consent provided a lawful basis for the searches here.

A warrantless search is unconstitutional "unless the government demonstrates that it can 'fall within certain established and well-defined exceptions to the warrant clause.'" *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1298 (9th Cir. 1988) (quoting *United States v. Perdomo*, 800 F.2d 916, 918 (9th Cir. 1988)). Consent constitutes one such exception: "a [warrantless] search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).

A person waives Fourth Amendment protections only when they give consent voluntarily, free from express or implied duress or coercion. *Id.* at 248. The validity

---

[4] Because the Court concludes that the searches of the vehicle and storage unit were valid under the consent exception to the warrant requirement, it need not reach the parties' disputes regarding the applicability of the automobile exception, the validity of the vehicle search as a probationary search, or whether the vehicle search qualified as a proper search incident to arrest.

of consent is judged objectively. *Florida v. Jimeno*, 500 U.S. 248, 252 (1991). The government bears the burden of proving that consent was "freely and voluntarily given." *Schneckloth*, 412 U.S. at 222 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).

Voluntariness is determined "based on the totality of circumstances surrounding the giving of consent." *United States v. Alfonso*, 759 F.2d 728, 740 (9th Cir. 1985). The Ninth Circuit has identified several factors to be considered in determining whether consent was voluntary:

> (1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that she had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained.

*United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002) (citing *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1989)). None of these factors is dispositive: "[t]he fact that some of these factors are not established does not automatically mean that consent was not voluntary." *Castillo*, 866 F.2d at 1082. They serve as guideposts, "not [as] a mechanized formula to resolve the voluntariness inquiry." *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004).

A review of these factors supports the conclusion that Griggs voluntarily consented to the searches.[5]

### 1.    In Custody

As for the first factor, "a seizure occurs when a law enforcement officer, by physical force or show of authority, in some way restrains the liberty of a citizen." *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). A person's liberty is restrained when, considering all the circumstances of the encounter, the officer's conduct "would have communicated to a reasonable person that [she] was not at liberty to ignore the police presence and go about [her] business." *Id.* (internal quotation marks omitted) (quoting *Bostick*, 501 U.S. at 437).

Custody, however, is not synonymous with a Fourth Amendment seizure. Custody requires "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). A traffic stop

---

[5] Griggs had authority to consent to the searches of both the vehicle and the storage unit. *See United States v. Childs*, 944 F.2d 491, 494 (9th Cir. 1991) (a person with joint access or control over property has authority to consent to a search). Ditonno's claim that he was never asked for consent is contradicted by the record. (*See* Doc. 42 at 2, 8). Hallam advised him that he retained some expectation of privacy in his belongings inside the unit, and Ditonno verbally consented to a search of those items before invoking his right to counsel rather than signing a written form. (Ex. 506 at 35:31–37:25). Aside from his inaccurate assertion, Ditonno does not challenge the validity of his own consent or argue that his consent was required. Instead, he adopts Griggs's argument that her consent was coerced. (Doc. 42 at 8 n.3). Therefore, the Court does not analyze the voluntariness or necessity of Ditonno's consent.

is a limited intrusion on personal liberty that does not rise to the level of a formal arrest. *United States v. Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023). Although a traffic stop or *Terry* stop can escalate into a custodial situation, "the temporary and relatively nonthreatening" nature of such a detention does not, by itself, amount to custody. *Howes v. Fields*, 565 U.S. 499, 510 (2012) (citation omitted).

The Ninth Circuit considers several factors when determining whether a person is in custody:

> (1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of [her] right to terminate the encounter.

*United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009) (quoting *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004)). Being in custody "does not itself negate voluntariness" for purposes of consent to search. *Alfonso*, 759 F.2d at 741.

In *Brown*, 563 F.3d at 415, the Ninth Circuit held that the defendant was not in custody even though she and her codefendant "were admittedly approached by five or six officers with guns drawn—and were both ordered to the ground, handcuffed, and patted down for weapons." The court emphasized that the encounter occurred in public, that officers holstered their weapons once the defendants were secured, and "that the officers treated [the two defendants] very differently." *Id.* One defendant "was arrested, placed in a squad car, and driven to

. . . [j]ail," while the other was told she was not under arrest, was released from her handcuffs, was allowed to travel alone, and was specifically asked for consent before each search. *Id.* at 415–16.

Considering the totality of the circumstances here, Griggs was not in custody. Griggs argues that she "was in custody from the second she was made to step out of [the] truck" because a reasonable person in her position "would not feel free to get up and walk away from . . . Hallam." (Doc. 57 at 4–5). This argument conflates seizure with custody. Griggs was seized for purposes of the Fourth Amendment when Fjetland initiated the traffic stop, but that does not mean she was in custody for purposes of evaluating the voluntariness of her consent. While Ditonno's encounter escalated into custody, Griggs's did not.

The temporary and nonthreatening nature of Griggs's detention, along with the surrounding circumstances, weighs against a finding of custody. Fjetland initially asked Griggs to step out of the vehicle for "a conversation." (Ex. 505 at 13:05–09). Within minutes of the stop, Griggs was advised of her *Miranda* rights, admitted to possessing drugs for personal use, and volunteered to retrieve them. (*Id.* at 13:40–15:15). Except for one moment when Hallam raised his voice while asking where the drugs were located in the storage unit (*Id.* at 19:55–20:33), officers maintained a conversational tone. They allowed her to retrieve a drink from her

cooler, tend to her dog throughout the interaction, and walk back to the truck alone after hugging Ditonno.

When she accompanied Hallam to his vehicle, he reiterated that she was not under arrest, asked her to sit inside to cool down, and left the door open. (Ex. 506 at 11:53–12:00). He later apologized for raising his voice. (*Id.* at 12:24–12:55). She appeared to understand and immediately resumed answering questions. (*Id.*). When officers permitted Griggs to search for the storage-unit key in the truck, they joked with her not to pull out a knife, and she laughed. (*Id.* at 17:02–12). The interaction was largely cordial.

The only point at which her freedom of movement was meaningfully restricted was during the short drive to the storage unit, when she sat in the back of Hallam's vehicle with her dog. (*Id.* at 49:55–57:18). Hallam did not take her phone until he saw her texting. (*Id.* at 51:30–51:55). His request was reasonable given officer-safety and evidence-preservation concerns, and he told her he would "give it right back." (*Id.* at 51:54–56). Otherwise, Griggs was never formally arrested, handcuffed, or physically restrained.

Although several officers were present, Griggs primarily interacted with Hallam and Fjetland, and usually with only one officer at a time. Officers were armed but never drew or displayed their weapons. The encounter occurred on a public roadway with passing traffic, not in a police-dominated environment.

Officers advised her of her right not to answer questions and her right to refuse consent, and she chose to cooperate. She was never threatened with arrest if she declined. At the end of the encounter, law enforcement did not arrest Griggs and allowed her to drive the truck away. (Doc. 42-1 at 2).

As in *Brown*, the officers' markedly different treatment of Ditonno reinforces that Griggs was not in custody. Griggs herself notes that there were "[f]our different officers for two occupants, one who was summarily hand[]cuffed and immobilized immediately." (Doc. 57 at 5). That distinction underscores that Ditonno—not Griggs—was the individual in custody.

Accordingly, this factor weighs in favor of finding that Griggs's consent was voluntary.

### 2.    *Guns Drawn*

Use of firearms by police prior to obtaining consent can create a coercive environment that renders consent involuntary. *United States v. Perez*, 644 F.2d 1299, 1303 (1981). As reflected in the body-worn camera videos—and as Griggs acknowledges (Doc. 57 at 7)—officers did not draw their weapons at any point during their interaction with Griggs or Ditonno. This factor therefore weighs in favor of voluntariness.

/ / /

/ / /

### 3. Miranda *Warnings*

The advisal of *Miranda* rights weighs in favor of a finding of voluntariness. *See Perez*, 644 F.2d at 1303. As shown in the video, Fjetland provided Griggs with *Miranda* warnings after she stepped out of the vehicle. (Ex. 505 at 3:39–4:10). He began by stating, "Alright so here's the deal, I'm going to read you your rights under Miranda . . . and then I'll let you decide if you want to speak to me about what's actually happening here, okay?" (*Id.* at 3:39–47). Griggs responded, "Okay." (*Id.* at 3:46–47). Fjetland then explained her right to remain silent and her right to an attorney. (*Id.* at 3:47–4:00). As he did so, he periodically asked, "Okay?" and Griggs responded affirmatively—nodding and saying "mm-hmm" or "okay." (*Id.*).

Fjetland further advised, "You can decide at any time to not answer any questions or make any statements towards me." (*Id.* at 4:00–06). He then asked, "Does all that make sense to you?" (*Id.* at 4:06–08). The video shows Griggs nodding and appearing to say "yeah." (*Id.* at 4:08–09). He followed up by asking, "that being said, I have some questions, will you answer them?" (*Id.* at 4:09–11). Again, Griggs appears to nod and say "yeah." (*Id.* 4:11–12).

Griggs does not dispute that she received *Miranda* warnings but argues that her waiver was coerced because Fjetland "glossed right over" asking her to waive her rights. (Doc. 57 at 6–7). The Court disagrees. Fjetland expressly told Griggs she could decide whether to speak with him, then read her rights, confirmed she

understood them, and only then asked whether she would answer questions. Griggs voluntarily agreed to speak, never invoked her right to counsel, and did not attempt to terminate the questioning. She continued to cooperate throughout the encounter. Nothing in the video suggests coercion.

Griggs was properly advised of her *Miranda* rights and voluntarily waived them by choosing to speak with Fjetland. Therefore, this factor weighs in favor of finding that her consent was voluntary.

### 4.    Notice of Right to Refuse Consent

Knowledge of the right to refuse consent is "highly relevant" to determining whether consent is valid. *United States v. Mendenhall*, 446 U.S. 544, 558–59 (1980). Officers are not required to inform an individual of that right, though doing so weighs in favor of voluntariness. *United States v. Drayton*, 536 U.S. 194, 206 (2002). A signed written consent form may also serve as evidence of voluntary consent when considered with the surrounding circumstances. *See United States v. Medina-Gallegos*, 162 F. App'x 768, 769 (9th Cir. 2006).

Griggs contends that this factor does not support voluntariness because officers allegedly "threaten[ed] and coerc[ed] [her] throughout the interaction." (Doc. 57 at 8). The Court disagrees. The body-worn camera footage does not show coercive conduct. Instead, the video demonstrates that Griggs was expressly advised—both verbally and in writing—of her right to refuse consent. (Ex. 505 at

30:29–31:09). She reviewed and signed a written consent form that clearly outlined

that right. (*Id.*). After explaining the form, Fjetland allowed Griggs time to read it

at her own pace before signing. (*Id.* at 30:29–43:10). Nothing in the video suggests

that Griggs was confused about the form or about Fjetland's statements regarding

her ability to decline consent.

Because Griggs was advised that she could refuse consent, this factor weighs

in favor of finding her consent voluntary.

### 5. *Notice that a Search Warrant Could be Obtained*

An officer's statement that a search warrant could be obtained is the final

factor that weighs against a finding of voluntariness. *Chan-Jiminez*, 125 F.3d at

1327. The weight of this factor "depends on the particular circumstances of the case

and thus hinges on whether a suspect is informed about the possibility of a search

warrant in a threatening manner." *United States v. Cormier*, 220 F.3d 1103, 1112

(9th Cir. 2000). It weighs against voluntariness when officers threaten to obtain a

warrant in a way that suggests "withholding of consent would ultimately be futile."

*United States v. Kim*, 25 F.3d 1426, 1432 (9th Cir. 1994).

Griggs argues that even though "[l]aw enforcement may not have used the

specific words 'I can get a search warrant,'" they nevertheless conveyed a warrant

threat through other statements and actions. (Doc. 57 at 8–9). She points to

Hallam's comment that they were going to search the storage unit, Hallam's cutting

into a lockbox in Ditonno's presence, and Fjetland's statement that they "got one coming," which she asserts was loud enough for both Ditonno and Griggs to hear. (*Id.*).

The Government asserts that "the video clearly indicates . . . [that] law enforcement did not threaten that a warrant could be obtained." (Doc. 51 at 22). The Court agrees.  Griggs's argument rests on speculation about how officers' statements might have been interpreted, but the body-worn camera footage contains no express or implied threat that a warrant could be obtained if consent were withheld.  None of the cited statements conveyed that a refusal would be futile or that a warrant was imminent.  Thus, this final factor weighs in favor of voluntariness.

Considering that all factors weigh in favor of voluntariness, and viewing the encounter under the totality of the circumstances, the Court concludes that Griggs's consent was voluntary.  The interaction between Griggs and law enforcement was cordial and reflects no coercive conduct.  She not only provided verbal consent but also signed a written waiver.  Accordingly, the searches of the vehicle and storage unit were voluntary.

## IV.    Conclusion

Because the Court concludes that the initial stop, the prolongation of the stop, and the searches of both the vehicle and the storage unit complied with the Fourth Amendment, suppression is unwarranted and the Indictment will not be dismissed.

IT IS HEREBY ORDERED that:

(1)    Defendant Ryan Taylor Ditonno's Motion to Suppress Evidence and Dismiss Indictment (Doc. 41) is DENIED.

(2)    Defendant Britni Denae Griggs's Motion to Dismiss (Doc. 44) is DENIED.

DATED this _10th_ day of February, 2026.

Susan P. Watters

SUSAN P. WATTERS
United States District Judge